DECISION
{¶ 1} Jason D. Lozier appeals from his convictions of abduction, robbery and burglary. He assigns a single error for our consideration:
 THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE APPELLANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION AND WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 2} The standard of review for sufficiency of the evidence is if, while viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have *Page 2 
found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 3} Sufficiency of the evidence is the legal standard applied to determine whether the case should have gone to the jury. Id. In other words, sufficiency tests the adequacy of the evidence and asks whether the evidence introduced at trial is legally sufficient as a matter of law to support a verdict. Id. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Jenks, at syllabus paragraph two, following Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781. The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact. Jenks, at 273. If the court determines that the evidence is insufficient as a matter of law, a judgment of acquittal must be entered for the defendant. See Thompkins, at 387.
 {¶ 4} In Jenks, the Supreme Court of Ohio set forth the role of an appellate court in reviewing a challenge to the sufficiency of the evidence:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
Id. at paragraph two of the syllabus. *Page 3 
 {¶ 5} In determining whether a verdict is against the manifest weight of the evidence, this court acts as a "thirteenth juror." This role allows the court to weigh the evidence in order to determine whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins, at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. However, the power to reverse on "manifest weight" grounds should only be used in exceptional circumstances, i.e., when "the evidence weighs heavily against the conviction."Thompkins, at 387, quoting Martin, at 175.
 {¶ 6} An appellate court acting in its role as "thirteenth juror" also must keep in mind the trier of fact's superior, first-hand position in judging the demeanor and credibility of witnesses. "On the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of facts."State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. A court of appeals cannot reverse a jury verdict on manifest-weight grounds unless all three appellate judges concur.Thompkins, at 389, and paragraph four of the syllabus.
 {¶ 7} The prosecution testimony at trial came from four witnesses: Michelle Ritchey, Donald Stupp, Lori Patten and Detective Arthur Hughes. The testimony on behalf of the defense came from John Anderson and Jason Lozier himself.
 {¶ 8} Michelle Ritchey lived at an apartment at 4040 North High Street near Lori Patten on September 16, 2005. On that day, Michelle heard Lori talking to a man in the hallway. The man said he needed money and Lori said she had no money so could not help. Michelle thought it was odd for Lori to be talking to someone who was not Lori's caseworker or family. Michelle recognized Jason Lozier as being the man talking to Lori. *Page 4 
 {¶ 9} Michelle later heard Lori scream as if Lori were in trouble. Michelle went to see her and found Lori in hysterics. Lori said, "[h]e tried to choke me. He tried to choke me." (Tr. 49.) Michelle then called the police and the property manager for the apartment complex.
 {¶ 10} On cross-examination, Michelle acknowledged that Jason Lozier and another individual had lived in the apartment across the hall from her but had moved out before September 16, 2005.
 {¶ 11} The second witness at trial was Donald Stupp, the apartment manager. On September 16, he saw Jason Lozier at the apartment complex. Jason had abandoned some small items when he left his apartment over a month earlier. The apartment had been cleaned in the meantime.
 {¶ 12} Later, Stupp got a call from Michelle Ritchey telling him Lori Patten had been attacked. Stupp went to Lori's apartment and arrived before the police. Later Stupp identified Jason Lozier from a photo array.
 {¶ 13} On cross-examination, Stupp acknowledged that Lori Patten had accused the apartment complex's maintenance man of robbing her but no such robbery occurred to Stupp's knowledge. The quarters Lori thought were stolen were later found in her apartment.
 {¶ 14} Lori Patten was the third witness to testify. Lori indicated that she lives at 4040 North High Street and works as a dishwasher at a nursing home. Lori has a caseworker to help her manage her affairs.
 {¶ 15} On September 16, 2005, Lori was leaving her apartment when she was approached by a man she did not know. The man was Jason Lozier. Jason said he was *Page 5 
homeless and needed help. Lori did not indicate she could help and indicated that she was on her way to pay her rent. Then Jason forced his way into Lori's apartment, put his hand on her mouth and said, "[g]ive me your money." (Tr. 103.)
 {¶ 16} Lori pulled Jason's hand away and screamed. Jason then fled out the back door of the building.
 {¶ 17} On cross-examination, Lori indicated that she is disabled and gives money to "her staff" after each payday and the "staff" makes sure her bills are paid. She denied ever accusing the maintenance man of stealing from her.
 {¶ 18} The fourth witness to testify was Arthur Hughes, a detective with the robbery squad of the Columbus Division of Police. After describing the general duties of a detective with the robbery squad, Detective Hughes testified that he responded to 4040 North High Street after the report of a robbery of a mentally disabled person. There was no evidence to collect because Jason Lozier touched nothing but the person of Lori Patten.
 {¶ 19} Stupp provided Detective Hughes the license plate number for the vehicle Lozier drove which the detective recorded. The license plate number helped the detective develop a photo array which included the picture of another individual, since Lozier was not the titled owner of the vehicle. Neither Stupp nor Michelle Ritchey identified the photo as being of someone involved.
 {¶ 20} Lori Patten was very upset when interviewed by Detective Hughes. Detective Hughes eventually was able to develop Jason Lozier as a suspect after talking to the owner of the vehicle identified by Stupp. The detective developed a second photo array which included Jason Lozier's photograph. Michelle Ritchey picked out two photos *Page 6 
as resembling the person involved, one of which was a picture of Jason Lozier. Lori Patten picked out someone else's photograph.
 {¶ 21} Detective Hughes called Jason Lozier, who acknowledged that he was at the apartment building that day. Detective Hughes then went to interview Lozier at Lozier's home.
 {¶ 22} When interviewed, Lozier claimed that he had not in fact been to the apartment building on September 16, 2005. Then Lozier claimed that he had been there to pick up mail. He claimed he was there alone and then acknowledged that his girlfriend had been there with him.
 {¶ 23} On cross-examination, Detective Hughes reviewed his interview of the prior witnesses for the jury. On re-direct examination, Detective Hughes reviewed the key points of his direct examination.
 {¶ 24} The defense witnesses were John Anderson, Jason Lozier's brother, and Jason Lozier himself. John Anderson testified that he went to the Clintonville Commons apartment buildings on September 16, 2005, and that he parked by the back door. Jason had called earlier to tell John that he would need a ride home after collecting some belongings at the apartment building. Jason's girlfriend was with him.
 {¶ 25} After John parked, Jason and Jason's girlfriend, Nicole, walked out to the car. Nicole got in the car and Jason went back into the building briefly. Jason then returned to the car, again walking. John saw or noticed nothing unusual.
 {¶ 26} On cross-examination, John testified that Jason was not carrying anything when he left the building. *Page 7 
 {¶ 27} Jason Lozier testified that he lived at 4040 North High Street for a brief time with Robert Perry and Nicole Perry, who was Robert's niece and Jason's girlfriend. Because of Robert Perry's drinking and money disputes, he and Nicole moved out. Jason had a job and got his own apartment with Nicole.
 {¶ 28} Jason claimed that he thought Robert Perry still lived at the apartment on September 16, 2005. While there, Jason saw Lori Patten and Michelle Ritchey. He talked to Lori Patten to find out if Robert Perry still lived there. Lori said she did not think so. Michelle Ritchey said the same.
 {¶ 29} Jason denied touching Lori Patten or forcing her into her apartment. He also denied trying to take anything. He had cash in his pocket and a paycheck of roughly $600 from working as a stucco mason. After he left 4040 North High Street he went to cash his paycheck.
 {¶ 30} Later, Jason talked to Detective Hughes about the robbery claims of Lori Patten.
 {¶ 31} On cross-examination, Jason acknowledged having contact and conversation with Lori Patten and Michelle Ritchey, but denied that the conversation involved money or an attempt to get money from Lori Patten.
 {¶ 32} To the extent the issue presented by the assignment of error is sufficiency of the evidence, the assignment of error is easily addressed. What Lori Patten said happened, if believed by the jury, was clearly sufficient to support the convictions. She was restrained by force and money was sought from her. He entered her apartment without permission as part of an attempt to take money. The elements of abduction, robbery and burglary are all present. *Page 8 
 {¶ 33} For purposes of a manifest weight of the evidence analysis, we do not accept everything presented in the State's case as true, but, instead, do a limited weighing of the evidence, sitting as the proverbial thirteenth juror. Within the parameters set forth by the Supreme Court of Ohio, we cannot say the jury verdict was against the manifest weight of the evidence. Lori Patten's version of the facts seemed credible on its face and Michelle Ritchey's corroboration of key facts, such as Lori's crying out for help, support the jury verdicts rendered.
 {¶ 34} We overrule the assignment of error. As a result, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
 SADLER, P.J., and KLATT, J., concur. *Page 1